**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| PATRICK M. MURPHY, JR., Derivatively on Behalf of SNOWFLAKE, INC.<br><br>Plaintiff,<br><br>v.<br><br>FRANK SLOOTMAN, MICHAEL P. SCARPELLI, BENOIT DAGEVILLE, MICHAEL SPEISER, KELLY KRAMER, JEREMY BURTON, TERESA BRIGGS, MARK GARRETT, JAYSHREE ULLAL, CARL M. ESCHENBACH, and JOHN D. MCMAHON,<br><br>Defendants,<br><br>and,<br><br>SNOWFLAKE, INC.<br><br>Nominal Defendant. | CASE NO.:<br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPAINT

Plaintiff, by and through his undersigned counsel, derivatively on behalf of Snowflake, Inc. ("Snowflake" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have occurred from September 16, 2020 through to March 2, 2022 (the "Relevant Period") and have caused substantial harm to the Company.

2.      Snowflake is a cloud data platform that enables its enterprise customers to consolidate data into a single source to build data-driven applications and share data.  Snowflake's platform purportedly enables customers to store data that can be accessed and shared by multiple users, and its data cloud enables data storage, processing, and analytic capabilities. The governed data access of Snowflake's software purportedly allows users to securely share data inside and outside of their organizations, generally without copying or moving the underlying data.  As a result, customers can blend existing data with new data for broader context, augment data science efforts, or create monetization streams.

3.      On August 24, 2020, Snowflake filed with the SEC a registration statement on Form S-1 for its IPO, which, after several amendments, was declared effective on September 15, 2020 (the "Registration Statement").  On September 16, 2020, the Company filed with the SEC a prospectus on Form 424B4 which incorporated and formed part of the Registration Statement (the "Prospectus").  Defendants used the Registration Statement to sell 32.2 million Snowflake Class A shares to investors at $120 per share, which included the full exercise of the underwriters' over-allotment option, generating over $3.8 billion in gross offering proceeds.  In addition, Snowflake conducted a $500 million private placement with certain institutional investors at the time of the IPO.  The Registration Statement highlighted Snowflake's "significant growth in recent periods" and a number of strategies to "drive" ongoing "growth," causing the price of Snowflake Class A stock to double on its first day of trading to $245 per share.

4.      Over the next several quarters, the price of Snowflake stock skyrocketed up to over $400 per share as defendants continued to paint a rosy picture of the Company's business and prospects.  For the next several quarters, certain of the Individual Defendants claimed that Snowflake experienced triple-digit product revenue growth.

5.      Snowflake's remaining performance obligations likewise purportedly experienced triple-digit growth each quarter from the third fiscal quarter of 2021 to the second fiscal quarter of 2022, achieving growth as high as 240% year-over-year for its third fiscal quarter ended October 31, 2020.

6.      Throughout the Relevant Period, certain of the Individual Defendants highlighted these favorable financial and operating trends, repeatedly raising the Company's revenue and earnings guidance.  The Individual Defendants also claimed that Snowflake's momentum was accelerating with "record-breaking consumption" and "broad industry adoption," indicating that these growth trends were expected to continue. Certain of the Individual Defendants (defined below) took advantage of the heightened price of Snowflake stock to sell over $1.8 billion worth of their own Snowflake shares during the Relevant Period.

7.      Unbeknownst to shareholders, however, the statements regarding Snowflake's business, financial results, and prospects were materially false and misleading when made, as detailed herein.  Specifically, Snowflake's purported growth had been built on unsustainable and deceptive business tactics as Snowflake's salesforce had knowingly and systematically oversold consumption credits to clients.  These sales tactics temporarily and artificially boosted the Company's revenue and remaining performance obligations, creating a misleading impression of demand for Snowflake's products and services. In addition, Snowflake sales personnel had offered customers short-term, unsustainable price discounts leading up to the IPO that temporarily boosted the Company's sales and revenue which failed to reflect the true costs of the Company's products. As the Individual Defendants knew or recklessly disregarded and failed to disclose, many of Snowflake's customers were not coming close to using their contracted credit levels, causing

3

clients to roll over unused credits (and thereby cannibalize future sales) at the end of their contracts' terms or to refuse to renew their contracts at prior consumption levels or at all. In addition, many customers were reluctant to pay the full price for Snowflake's products or services, creating a concealed demand cliff that was poised to materially curtail the Company's growth trends as customers who had been oversold credits (often at unsustainably discounted prices) reached the end of their contracts' term periods. Indeed, during the Relevant Period, the Individual Defendants were forced to implement platform efficiency "enhancements" to lower the cost of Snowflake's platform which effectively lowered customer consumption and negatively impacted the Company's revenue and margins.

8.     Then, after market hours on March 2, 2022, Snowflake reported results for its fourth fiscal quarter ended January 31, 2022 and disappointing fiscal 2023 guidance. The Company's product revenue growth rate for fiscal 2023 was projected to be slashed to a range of 65% to 67%, far below the triple-digit growth and purportedly ongoing favorable business trends highlighted by the Individual Defendants during the Relevant Period. Notably, since Snowflake's customers generally sign one-year contracts which can be extended or rolled-over, this dramatic decline represented many customers who had been sold contracts around the time of the IPO which were now coming up for renewal.

9.     On a related fourth quarter 2022 earnings call also held on March 2, 2022, Defendant Michael Scarpelli further revealed that Snowflake customers were consuming at a reduced rate, which he blamed on "platform enhancements . . . which lowered credit consumption." Defendant Scarpelli claimed that while "these efforts negatively impact our revenue in the near term, over time, they lead customers to deploy more workloads to Snowflake due to the improved economics."

10.     The Individual Defendants' explanations were contradicted by results in subsequent reporting periods, as Snowflake's financial results did not improve. For instance, for the fourth quarter of fiscal 2023 (ended January 31, 2023) the Company achieved only 54% year-

over-year product revenue growth and 38% year-over-year growth in remaining performance obligations. The Company also suffered a $207 million quarterly net loss, approximately 57% higher than the prior year period. These trends continued to worsen for Snowflake, resulting in just 34% year-over-year product revenue growth, 23% year-over-year remaining performance obligations growth, and a $215 million quarterly net loss for the third fiscal quarter ended October 31, 2023, confirming the one-off and unsustainable nature of the growth metrics defendants highlighted for investors during the Relevant Period as certain of the Individual Defendants dumped over $1 billion worth of their personal holdings of Snowflake stock at artificially inflated prices.

11.     Following the disappointing March 2, 2022 disclosures, the price of Snowflake Class A common stock dropped precipitously from $264.69 per share when the market closed on March 2, 2022 to $224.02 per share when the market closed on March 3, 2022, a 15% decline, on abnormally heavy volume of over 33 million shares traded. The stock price continued to decline another nearly 15% over the next few trading days, closing at just $191.61 on March 8, 2022 – far below the price at which the Individual Defendants had sold their own Snowflake shares during the Relevant Period.

## JURISDICTION

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as the claims asserted herein arise under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"). This Court also has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

15.     In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

16.     **_Plaintiff Patrick M. Murphy, Jr._** ("Murphy") is, and was at relevant times, a shareholder of the Company.  Plaintiff Murphy will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

17.     **_Nominal Defendant Snowflake_** is incorporated under the laws of Delaware with its principal executive offices located in Bozeman, Montana. Snowflake's common stock trades on the NYSE exchange under the symbol "SNOW."

### Director Defendants

18.     **_Defendant Frank Slootman_** ("Slootman") has served as a Company director since April 2019 and is presently the Chairman of the Board of Directors (the "Board"). Defendant Slootman was previously the Company's Chief Executive Officer ("CEO") and led the Company

through its IPO in 2020. As a result of the wrongdoing alleged herein, Defendant Slootman is named as a defendant in the Securities Class Action (defined below).

19.     **Defendant Benoit Dageville** ("Dageville") has served as a Company director since August 2012 and is also the Company's Co-Founder. Defendant Dageville also presently serves as the Company's President of Products and previously was the Company's Chief Technology Officer from 2012 through to 2019.

20.     **Defendant Michael Speiser** ("Speiser") has served as a Company director since July 2012 and as the Company's lead independent director since December 2019. Defendant Speiser also previously served as the Company's part-time CEO and Chief Financial Officer ("CFO") from August 2012 through to June 2014. Defendant Speiser also serves as Chair of the Nominating and Governance Committee and as a member of the Compensation Committee.

21.     **Defendant Kelly Kramer** ("Kramer") has served as a Company director since January 2020. Defendant Kramer also serves as a member of the Audit Committee.

22.     **Defendant Jeremy Burton** ("Burton") has served as a Company director since March 2016.

23.     **Defendant Teresa Briggs** ("Briggs") has served as a Company director since December 2019. Defendant Briggs also serves as a member of the Audit Committee.

24.     **Defendant Mark Garrett** ("Garrett") has served as a Company director since April 2018. Defendant Garret also serves as Chair of the Audit Committee and as a member of the Nominating and Governance Committee.

25.     **Defendant Jayshree Ullal** ("Ullal") has served as a Company director since June 2020. Defendant Ullal is the Chair of the Compensation Committee.

26.     Defendants in paragraphs 18-25 are referred to herein collectively as the "Director Defendants."

**Officer Defendant**

27.     **Defendant Michael Scarpelli** ("Scarpelli") has served as the Company's CFO since 2019 and navigated the Company through its IPO in 2020. Because of the wrongful conduct alleged herein, Defendant Scarpelli is a named defendant in the Securities Class Action.

**Former Director Defendants**

28.     **Defendant Carl M. Eschenbach** ("Eschenbach") was a director of the Company from 2019 to 2023.

29.     **Defendant John D. McMahon** ("McMahon") was a director of the Company from 2013 to 2023.

30.     Defendants Eschenbach and McMahon are collectively referred to herein as the "Former Director Defendants."

31.     The Director Defendants along with the Former Director Defendants are sometimes collectively referred to herein as the "Director Defendants."

32.     The Director Defendants along with Defendant Scarpelli and the Former Director Defendants are collectively referred to herein as the "Individual Defendants."

**Non-Parties**

33.     **Non-Party Sridhar Ramaswamy** ("Ramaswamy") is the Company's CEO and director as of 2024. Non-Party Ramaswamy initially joined the Company in May 2023 in connection with the Company's acquisition of Neeva.

34.     **Non-Party Steve Burke** ("Burke") has served as a Company director since 2023. Non-Party Burke also serves as a member of the Compensation Committee and the Nominating and Governance Committee.

35.     **Non-Party Mark McLaughlin** ("McLaughlin") has served as a Company director since 2023. Non-Party McLaughlin also serves as a member of the Compensation Committee.

36.     Non-Parties Ramaswamy, Burke, and McLaughlin are named solely for the purposes of demand futility.

## SUBSTANTIVE ALLEGATIONS

8

**Background**

37.     Snowflake is a cloud data platform that enables its enterprise customers to consolidate data into a single source to build data-driven applications and share data.  Snowflake's platform purportedly enables customers to store data that can be accessed and shared by multiple users, and its data cloud enables data storage, processing, and analytic capabilities. The governed data access of Snowflake's software purportedly allows users to securely share data inside and outside of their organizations, generally without copying or moving the underlying data.  As a result, customers can blend existing data with new data for broader context, augment data science efforts, or create monetization streams.

38.     Snowflake's cloud-native architecture consists of three (3) layers across storage, compute, and cloud services.  The storage layer incorporates structured and semi-structured data to create a unified data record.  The compute layer enables users to simultaneously access common data sets for a variety of use cases.  The cloud services layer optimizes each use case's performance requirements. This architecture is interconnected to create Snowflake's single cloud data platform. The more customers that adopt Snowflake's platform, the more data that can be exchanged with other Snowflake customers, partners, and data providers.

39.     Snowflake delivers its platform through a consumption base model, where customers only pay for the resources they use. Revenue is recognized as credits are consumed. However, the majority (more than 90% of revenue at the time of the Company's initial public offering (the "IPO")) of Snowflake's customers are under capacity arrangements, in which they commit to a certain amount of consumption at specified prices.  Under capacity arrangements, Snowflake typically bills its customers annually in advance of their consumption.  Unused capacity can generally be rolled over to new or extended contract terms, although Snowflake may require customers to purchase additional capacity in order to do so.  Snowflake's other contract type provides for on-demand arrangements, in which the Company charges for the use of its platform monthly in arrears.

40.     Snowflake's key business metrics closely followed by analysts and investors include: (i) product revenue; and (ii) remaining performance obligations.  Product revenue includes compute, storage, and data transfer resources, which are consumed by customers on Snowflake's platform as a single, integrated offering.  Remaining performance obligations represent the amount of contracted future revenue that has not yet been recognized.  Customers have the flexibility to consume more than their contracted capacity during the contract term and could in many cases roll over unused capacity to future periods, generally with the purchase of additional capacity.

41.     Snowflake has historically not been profitable.  In the six-month period ending July 31, 2020 (the last full quarter prior to the IPO), the Company generated over $171 million in net losses.  This represented a decrease from the $177 million in net losses the Company generated in the six months ending July 31, 2019, which indicated to shareholders that the Company was moving towards profitability as it increased in scale and operational efficiencies.  Because of the Company's historical losses it was important to shareholders that Snowflake continued to improve its margins and ultimately achieve positive cash flows and profitability.

42.     Usage of Snowflake's software presents a significant learning curve, especially for new users.  This is both because the software is itself relatively complex, and because the Company operates in a relatively nascent industry.  As a result, new Snowflake customers rely heavily on Company sales executives to guide them in determining how much data credits they should purchase for the term of their contract.

43.     On August 24, 2020, Snowflake filed with the SEC the Registration Statement on Form S-1 for its IPO, which, after several amendments, was declared effective on September 15, 2020. The Registration Statement was signed by Defendants Slootman, Scarpelli, Dageville, Briggs, Burton, Eschenbach, Garrett, Kramer, McMahon, Speiser, and Ullal.

**MATERIALLY FALSE AND MISLEADING STATEMENTS**

44.     On September 16, 2020, Snowflake filed with the SEC the Prospectus for its IPO. The Prospectus stated that Snowflake's produced revenue, a "key business metric," grew 164%

from 2019 to 2020. The Prospectus also stated that "[p]reduce revenue increased primarily due to increased consumption of our platform by existing customers … as well as capacity sales price increases of approximately 12% year over year associated with better discipline over discounting."

45.     The Prospectus represented that Snowflake's customers' consumption "accelerates from the beginning of their usage to the end of their contract terms and often exceeds their initial capacity commitment amounts."

**3Q 2021**

46.     On December 2, 2020, Snowflake issued a press release which announced the Company's financial results for the third fiscal quarter ending October 31, 2020 ("3Q21 Release"). The release stated that Snowflake had achieved product revenue of $148.5 million during the quarter, representing a 115% year-over-year increase, and had $927.9 million in remaining performance obligations, representing a 240% year-over-year increase.  In the release, Defendant Slootman stated that the quarter was "'marked by continued strong revenue growth coupled with improving unit economics, cash flow, and operating efficiencies.'"

47.     That same day, Snowflake held an earnings call with analysts and shareholders to discuss Snowflake's third fiscal quarter of 2021 results hosted by Defendants Slootman and Scarpelli.  In his prepared remarks, Defendant Slootman stated:

> We saw strong consumption trends across our customer base in Q3, but product revenue growing 115% year on a year to $148 million and a net revenue retention rate of 162%. Coupled with this rapid growth, we continue to see improving unit economics, cash flow and operating efficiency.

48.     Defendant Scarpelli similarly highlighted the Company's 115% year-over-year product revenue growth and its 240% remaining performance obligations growth.  Defendant Scarpelli attributed Snowflake's "strong performance" to "our customer base realizing the value of our platform for their existing use cases while also embracing the Snowflake data cloud vision."

49.     Defendant Scarpelli also stated that Snowflake's business model allows "customers to consume their entire contract before the end of the term, which is what we often see."  Defendant

Scarpelli added that "we're seeing a lot better discipline in our field around discounting," and the average price per credit they are getting "continues to increase."

50.     During the question and answer portion of the call, the following exchange took place:

> **Brad Reback – Stifel**
>
> Mike, your comment earlier around less discounting, how much of that is a function of better execution in the field by the sales force versus customers just being much more comfortable migrating to the cloud and you being able to take advantage of that?
>
> **Defendant Scarpelli**
>
> I would say a lot of it is our better discipline in our sales force, but then also given the reference customers we have and what customers are seeing, they're more willing to move to Snowflake as well, too, which makes the procurement process easier.
>
> ***
>
> But what I will also tell you today is the product we're delivering today is so much better than what it was three years ago or two years ago, continues. And it becomes more, the performance on it every year, it gets better and better as a result, customers should pay more for it.

51.     On December 3, 2020, Snowflake filed with the SEC a quarterly report on Form 10-Q for the third quarter of 2021 ("3Q21 10-Q"). The 3Q21 10-Q was signed by Defendants Slootman and Scarpelli, who also attested to the report's accuracy and completeness through a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").

52.     The 3Q21 10-Q repeated the information regarding the Company's product revenue and remaining performance obligations contained in the 3Q21 Release.

**Q4 and Full Year 2021**

53.     On March 3, 2021, Snowflake issued a press release which announced the Company's financial results for the fourth quarter and full fiscal year ending January 31, 2021

("FY21 Release").  The release stated that Snowflake had achieved product revenue of $178.3 million during the fourth quarter, representing a 116% year-over-year increase, and had $1.3 billion in remaining performance obligations, representing a 213% year-over-year increase.

54.     In the FY21 Release, Defendant Slootman stated that "'[w]e finished our fiscal year with strong performance'" and that "'[r]emaining performance obligations showed a robust increase year-on-year, reflecting strength in sales across the board.'"

55.     That same day, Snowflake held an earnings call with analysts and shareholders to discuss Snowflake's fourth quarter and full fiscal year 2021 results hosted by Defendants Slootman and Scarpelli.  In their prepared remarks, Defendants Slootman and Scarpelli both highlighted the Company's product revenue and remaining performance obligations results. Defendant Slootman added that Snowflake "finished our fiscal year with strong consumption across our customer base."

56.     In response to a question from a Credit Suisse analyst, Defendant Scarpelli represented that Snowflake's customers were generally using up all of their consumption credits, stating that customers "consume very little in the first 6 months, and then in the remaining 6 months, they've consumed their entire contract."  Defendant Scarpelli further stated that, as a result, most customers then enter into "multiyear renewals once they've proven the use case on Snowflake."

57.     On March 31, 2021, Snowflake filed with the SEC an annual report on Form 10-K for the full year 2021 ("2021 10-K"). The 2021 10-K was signed by Defendants Slootman, Scarpelli, Dageville, Briggs, Burton, Eschenbach, Garrett, Kramer, McMahon, Speiser, and Ullal. The 2021 10-K also contained SOX certifications signed by Defendants Slootman and Scarpelli attesting to the report's accuracy and completeness.

58.     The 2021 10-K repeated substantially the same information regarding the Company's product revenue and remaining performance obligations contained in the FY21 Release.

**1Q 2022**

59.     On May 26, 2021, Snowflake issued a press release which announced the Company's financial results for the first fiscal quarter ending April 30, 2021 (the "1Q22 Release"). The 1Q22 Release stated that Snowflake had achieved product revenue of $213.8 million during the quarter, representing a 110% year-over-year increase, and had $1.4 billion in remaining performance obligations, representing a 206% year-over-year increase.  In the 1Q22 Release, Defendant Slootman stated that Snowflake's triple-digit product revenue growth "'reflect[ed] strength in customer consumption'" and that the Company's remaining performance obligations "'showed a robust increase year-on-year, indicating strength in sales across the board.'"

60.     That same day, Snowflake held an earnings call with analysts and shareholders to discuss Snowflake's first quarter 2022 results, hosted by Defendants Slootman and Scarpelli. In their prepared remarks, Defendants Slootman and Scarpelli both highlighted the Company's product revenue and remaining performance obligations results.

61.     On May 27, 2021, the Company filed its 2021 Proxy Statement on Schedule 14A with the SEC, solicited by Defendants Dageville, Garrett, Ullal, Kramer, Slootman, Speiser, Briggs, Burton, Eschenbach, and McMahon. The 2021 Proxy Statement solicited shareholder approval to: (1) re-elect Defendants Dageville, Garrett, and Ullal to the Board; and (2) ratify the selection of the independent registered public accounting firm.

62.     The 2021 Proxy Statement contained the following, in relevant part:

Our board of directors oversees our risk management processes, which are designed to support the achievement of organizational objectives, improve long-term organizational performance, and enhance stockholder value while mitigating and managing identified risks. A fundamental part of our approach to risk management is not only understanding the most significant risks we face as a company and the necessary steps to manage those risks, but also deciding what level of risk is appropriate for our company. Our board of directors plays an integral role in guiding management's risk tolerance and determining an appropriate level of risk.

\*\*\*

Our board of directors has adopted corporate governance guidelines to ensure that our board of directors has the necessary practices in place to review and evaluate

Snowflake's business operations and make decisions that are independent of our management.

***

Our board of directors has adopted an insider trading policy that applies to all of our employees, officers, contractors, and directors. This policy prohibits hedging or monetization transactions with respect to our common stock, including through the use of financial instruments such as prepaid variable forwards, equity swaps, and collars. In addition, our insider trading policy prohibits trading in derivative securities related to our common stock, which include publicly traded call and put options, engaging in short selling of our common stock, purchasing our common stock on margin or holding it in a margin account, and pledging our shares as collateral for a loan.

63.     However, the 2021 Proxy Statement was false and misleading when it discussed the above, because: (i) the Board did not effectively manage risk, which ultimately resulted in a reduced product revenue growth rate; (ii) the Board's corporate governance was insufficient; (iii) despite the existence of the Insider Trading Policy, certain Company insiders engaged in unlawful insider trading; and (iv) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly interested in their re-election to the Board to allow themselves to continue breaching their fiduciary duties to the Company.

64.     Furthermore, the 2021 Proxy Statement was false and misleading when it failed to disclose that (i) Snowflake had systematically oversold capacity to customers which created a misleading appearance of the demand for Snowflake's products and services; (ii) Snowflake had provided significant discounts to its customers prior to its IPO that temporarily boosted sales but would not be sustainable after the IPO and/or necessitate platform efficiency adjustments that negatively impacted client consumption and Snowflake's revenue and profit margins; (iii) as a result, Snowflake's customers were poised to roll over a material amount of unused credits (and thereby cannibalize future sales) at the end of their contracts' terms or to refuse to renew their contracts at prior consumption levels or at all; and (iv) consequently, Snowflake's product revenue and remaining performance obligations had been artificially inflated leading up to and during the

Relevant Period; and (v) that, as a result, defendants lacked a reasonable basis for their positive statements about Snowflake's business, financials, and growth trajectory.

65.     Had Company shareholders known of these facts prior to the Annual Meeting of Shareholders held on July 8, 2021, they would not have approved the re-election of Defendants Dageville, Garrett, and Ullal to the Boad.

66.     On June 4, 2021, Snowflake filed with the SEC a quarterly report on Form 10-Q for the first quarter of 2022 ("1Q22 10-Q"), which was signed by Defendants Slootman and Scarpelli, who also attested to the report's accuracy and completeness via SOX certifications. The 1Q22 10-Q repeated substantially the same information regarding the Company's product revenue and remaining performance obligations contained in the 1Q22 Release.

**2Q 2022**

67.     Then, on August 25, 2021, Snowflake issued a press release which announced the Company's financial results for the second fiscal quarter ending July 31, 2021 (the "2Q22 Release"). The 2Q22 Release stated that Snowflake had achieved product revenue of $254.6 million during the quarter, representing a 103% year-over-year increase, and had $1.5 billion in remaining performance obligations, representing a 122% year-over-year increase. In the 2Q22 Release, Defendant Slootman stated that "'Snowflake saw continued momentum in Q2 with triple-digit growth in product revenue, reflecting strength in customer consumption.'"

68.     That same day, Snowflake held an earnings call with analysts and investors to discuss Snowflake's second quarter 2022 results, hosted by Defendants Slootman and Scarpelli. In his opening remarks, Defendant Slootman commented that:

> We saw continued momentum in Q2 with 103% year-on-year growth to $255 million of product revenues, reflecting strength in Snowflake consumption.

69.     Defendant Scarpelli also stated that Snowflake "saw continued strength across the board in Q2 with great sales execution and operational efficiencies, setting us up for a strong back half of the year."

16

70.     During the question-and-answer portion of the call, the following exchange ensued:

**Gray Powell – BTIG**

[…] Thanks for taking the question, and congratulations on the strong results. So, yeah, maybe a high-level question on my side. I guess what do you see as the bigger driver of your business today? Is it the replacement of legacy data warehouse architectures, or is it more net new from modern companies like Instacart and Coinbase that start out and build businesses on top of Snowflake?

**Defendant Slootman**

This is Frank. It's actually an important question, you know, to ask because we have very high net revenue retention rates and people are often wondering, you know, where's that coming from because that's typically not seen. The reason is a lot of what Snowflake does is what we call enabling the demand. In other words, we're not creating it, we're allowing it to happen. So, there's a lot of latent bottled-up, pent-up demand that has literally grown over literally decades where people have -- because of fixed capacity limits on storage, on computational, or contractual limitations, they have not been able to do what the technology is now capable of doing. So, just unlocking that puzzle and allowing workloads to be provisioned, allow unlimited number of concurrent workloads, let jobs run every night as opposed to once a month, if you're lucky.

***That is really the explosion, the enablement of demand that was already there is really the big, big driver behind Snowflake****. Now, there are others. I mean, there are brand-new use cases that are exploding in several of these verticals that are driving a lot of demand as well. This is a very dynamic marketplace.

This is not, you know, OK, we have an existing workload, we're going to move it to the cloud and call it a day. That is not the nature of this business. This is a very fluid, dynamic process where people are doing brand-new innovative things. **The great thing about the public cloud combined with Snowflake is that technology is no longer standing in the way. What is only standing in the way now is your imagination and your budget**.

Those are not minor things, by the way, but that's a hell of a lot better than having, you know, a fixed limitation that we historically have had to live with.

(Emphasis added).

71.     Then, the following exchange took place:

**Derrick Wood – Cowen and Company**

17

Great. Thanks. And one for Mike, obviously, impressive to see that 169% net revenue retention. You had said at least 60 -- 160% this year.

You're kind of pushing it close to 170%. Are you -- should we still be thinking about, you know, at least 160%, and what do you see as the biggest drivers that could generate upside to your expectations?

**Defendant Scarpelli**

I don't think it's going to go up. I think we're going to continue to be above 160% for the balance of the year, what I said last quarter. And ***our large customers just continue to increase their consumption. When I look at the forecast for this quarter, our largest customers are continuing to consume at a very rapid pace***.

(Emphasis added).

72.     On September 2, 2021, Snowflake filed with the SEC a quarterly report on Form 10-Q for the second quarter of 2022 ("2Q22 10-Q"). The 2Q22 10-Q was signed by Defendants Slootman and Scarpelli, who also attested to the report's accuracy and completeness through SOX certifications. The 2Q22 10-Q repeated the information regarding the Company's product revenue and remaining performance obligations contained in the 2Q22 Release.

**3Q 2022**

73.     On December 1, 2021, Snowflake issued a press release which announced the Company's financial results for the third fiscal quarter ending October 31, 2021 (the "3Q22 Release"). The release stated that Snowflake had achieved product revenue of $312.5 million during the quarter, representing a 110% year-over-year increase, and had $1.8 billion in remaining performance obligations, representing a 94% year-over-year increase. In the release, defendant Slootman stated that "'Snowflake saw momentum accelerate in Q3'" and that "'Snowflake continues to see broad industry adoption.'"

74.     On the same day, Snowflake held an earnings call with analysts and investors to discuss Snowflake's third quarter 2022 results hosted by defendants Slootman and Scarpelli. In his opening remarks, defendant Scarpelli stated that "Q3 was a breakout consumption and bookings quarter for us." He added that the Company's "outperformance is fueled by our existing

customer base," and claimed that Snowflake was seeing its "largest customers continuing to expand their use of Snowflake." When asked by an analyst what drove this kind of revenue outperformance, Defendant Scarpelli stated that it was "driven by a number of large customers, whose businesses are growing dramatically."

75.     In regard to Company growth, defendant Slootman asserted that "we are just seeing the tip of the iceberg."  He expounded, stating that Snowflake was still in relatively early stages of its growth trajectory, but already "there is a very, very steady aggressive growth happening quarter-on-quarter."  Defendant Slootman further stated that the Company was expecting to reach a point where "the floodgates are open and things are just expanding at a meteoric rate."

76.     On December 3, 2021, Snowflake filed with the SEC a quarterly report on Form 10-Q for the third quarter of 2022 ("3Q22 10-Q"). The 3Q22 10-Q was signed by Defendants Slootman and Scarpelli, who also attested to the report's accuracy and completeness through SOX certifications.  The 3Q22 10-Q repeated the information regarding the Company's product revenue and remaining performance obligations contained in the 3Q22 Release.

77.     The above-referenced statements were materially false and misleading because the Individual Defendants knew or deliberately disregarded and failed to disclose: (i) Snowflake had systematically oversold capacity to customers which created a misleading appearance of the demand for Snowflake's products and services; (ii) Snowflake had provided significant discounts to its customers prior to its IPO that temporarily boosted sales but would not be sustainable after the IPO and/or necessitate platform efficiency adjustments that negatively impacted client consumption and Snowflake's revenue and profit margins; (iii) as a result, Snowflake's customers were poised to roll over a material amount of unused credits (and thereby cannibalize future sales) at the end of their contracts' terms or to refuse to renew their contracts at prior consumption levels or at all; and (iv) consequently, Snowflake's product revenue and remaining performance obligations had been artificially inflated leading up to and during the Relevant Period; and (v) that,

19

as a result, defendants lacked a reasonable basis for their positive statements about Snowflake's business, financials, and growth trajectory.

## THE TRUTH EMERGES

78.    On March 2, 2022, the Company reported its results for the fourth quarter ended January 31, 2022 and disappointing fiscal 2023 guidance. The Company's product revenue growth rate for fiscal 2023 was projected to be slashed to a range of 65% to 67%, far below the triple-digit growth and purportedly ongoing favorable business trends highlighted by certain of the Individual Defendants during the Relevant Period.

79.    Notably, since Snowflake's customers generally sign one-year contracts which can be extended or rolled-over, this dramatic decline represented many customers who had been sold contracts around the time of the IPO which were now coming up for renewal.

80.    On a related fourth quarter 2022 earnings call also held on March 2, 2022, Defendant Scarpelli further revealed that Snowflake customers were consuming at a reduced rate, which he blamed on "platform enhancements … which lowered credit consumption."  Defendant Scarpelli claimed that while "these efforts negatively impact our revenue in the near term, over time, they lead customers to deploy more workloads to Snowflake due to the improved economics."

81.    The above explanations were contradicted by results in subsequent reporting periods, as Snowflake's financial results did not improve.  For example, for the fourth quarter of fiscal 2023 (ended January 31, 2023) the Company achieved only 54% year-over-year product revenue growth and 38% year-over-year growth in remaining performance obligations.  The Company also suffered a $207 million quarterly net loss, approximately 57% higher than the prior year period.  These trends continued to worsen for Snowflake, resulting in just 34% year-over-year product revenue growth, 23% year-over-year remaining performance obligations growth, and a $215 million quarterly net loss for the third fiscal quarter ended October 31, 2023, confirming the one-off and unsustainable nature of the growth metrics the Individual Defendants highlighted

for investors during the Relevant Period.  Meanwhile, certain of the Individual Defendants dumped over $1 billion worth of their personal holdings of Snowflake stock at artificially inflated prices.

82.     Following the disappointing March 2, 2022 disclosures, the price of Snowflake Class A common stock dropped precipitously from $264.69 per share when the market closed on March 2, 2022 to $224.02 per share when the market closed on March 3, 2022, a 15% decline, on abnormally heavy volume of over 33 million shares traded.  The stock price continued to decline another nearly 15% over the next few trading days, closing at just $191.61 on March 8, 2022 – far below the price at which the Individual Defendants had sold their own Snowflake shares during the Relevant Period.

83.     As a result of the wrongful conduct alleged herein, the Company suffered significant damage.

## DAMAGES TO THE COMPANY

### Securities Class Action

84.     On February 29, 2024, a securities class action complaint was filed in the United States District Court for the Northern District of California against the Company and Defendants Slootman and Scarpelli.  The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Flannery v. Snowflake, Inc., et al.*, Case 3:24-cv-01234-PCP (N.D. Cal.) ("Securities Class Action")

85.     As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's former officers.  The Company will continue to incur significant sums in relation to the above Securities Class Actions and any liability or settlement that results.

### Unjust Compensation

86.     At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their

respective roles as officers and/or directors of the Company. In 2022 alone, certain of the Individual Defendants unjustly received over $8.4 million, as follows:

| Defendant | 2021 Total Compensation ($) | 2022 Total Compensation ($) | Total Compensation ($) |
|---|---|---|---|
| Slootman | 750,708 | 775,196 | 1,525,904 |
| Scarpelli | 600,708 | 620,298 | 1,221,006 |
| Dageville | 400,567 | 407,097 | 807,664 |
| Speiser | 14,625 | 364,867 | 379,492 |
| Kramer | 10,000 | 346,367 | 356,367 |
| Burton | 8,500 | 338,628 | 347,128 |
| Briggs | 10,000 | 346,367 | 356,367 |
| Garrett | 13,500 | 360,367 | 373,867 |
| Ullal | 1,981,663 | 349,867 | 2,331,530 |
| Eschenbach | 9,000 | 342,367 | 351,367 |
| McMahon | 9,000 | 344,106 | 353,106 |
| **TOTAL** | 3,808,271 | 4,595,527 | **8,403,798** |

87.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

88.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Insider Trading**

89.     While in possession of material, non-public information, that is the true business, financial, and operational prospects of the business, certain of the Individual Defendants decided to take advantage of the Company's artificially inflated stock price to garner substantial proceeds.

90.     During the Relevant Period, Defendants Slootman, Scarpelli, Dageville, Speiser, Burton, Briggs, Garrett, Eschenbach, and McMahon each took advantage of their insider knowledge and the Company's artificially inflated share price in order to reap gross proceeds of over $1.8 billion.

91.     Of the above $1.8 billion worth of stock sales, at least $1 billion worth of Snowflake stock was collectively sold by Defendants Slootman and Scarpelli, with over $585 million worth of stock being sold by Defendants Slootman and Scarpelli on December 15, 2021 when the stock was trading near all-time highs.

**Additional Damage to the Company**

92.     In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

93.     The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

94.     The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

95.     At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members.  Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

96.     Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

97.     At all relevant times, the Company had in place its Global Code of Conduct and Ethics ("Code of Conduct") which "applies to all employees, members of Snowflake Inc.'s Board of Directors […], contractors, and other contingent workers of Snowflake Inc." The Code of Conduct provides that it "is your guide for upholding Snowflake's values in your day-to-day activities."

98.     From the outset, the Code of Conduct outlines the Company's values:

# OUR VALUES

**Put Customers First**

We only succeed when our customers succeed. Work every day to earn our customers' business and trust. Listen to our customers, understand their needs and pain points, and focus on what matters to them. Deliver products our customers love. Compete fairly and passionately.

**Integrity Always**

Be open, honest and respectful. Speak up and communicate candidly, even when it makes you uncomfortable or may be something others don't want to hear. Constructive, respectful disagreement and debate encourages better problem-solving and decisions. Commit fully when decisions are made.

**Think Big**

Be ambitious and have big goals. Do what matters and focus on what's important. Innovate and be willing to take prudent risks. Make a positive impact and a lasting difference. Plan to win, play to win and expect to win.

**Be Excellent**

Quality and excellence count in everything we do. Do your best work every day. Hold yourself and others to the highest standards. Common sense, creativity, practicality and simplicity matter. Think strategically, balancing today and tomorrow.

**Get It Done**

Results matter! Work hard and smart. Execute. Be precise and accountable, yet nimble and agile. Make commitments, follow through and deliver.

**Own It**

Build our product and our company like it's yours, because it is. Hold yourself and others accountable at all times. Take initiative and ownership. Be responsible. Step up, own issues and resolve them. If you make a mistake, own it, fix it, learn from it and move on.

**Make Each Other The Best**

Treat people with kindness and respect. Be inclusive and collaborative, bringing people and ideas together. Offer help and ask for help when needed. Listen. Give and ask for constructive feedback. Give praise and celebrate success. Teach and learn every day. Give back to our communities in meaningful ways and inspire others with your actions.

**Embrace Each Other's Differences**

Accept and appreciate everyone from every walk of life. Be conscious and mindful that others may have a different experience from your own. Use our differences to strengthen who we are.

99.     With respect to "Insider Trading," the Code of Conduct makes clear:

Never trade in the stock of Snowflake or any other company based on material nonpublic information that you know. This is not only a violation of Snowflake policy, it is illegal. You must also not "tip" a third party based on material nonpublic information. See Snowflake's Insider Trading Policy for more information.

100.     In a section entitled "Compliance with Law," the Code of Conduct states:

Snowflake takes its obligation to follow the law very seriously. You should proactively make sure that you understand the laws and regulations that apply to your work. Each of us is personally responsible for complying with all applicable legal requirements and prohibitions. If you are doing business outside of the U.S., you must comply with applicable U.S. and local laws. You may not do business with a third party on behalf of Snowflake if you know or should know that it

25

engages in illegal activities. If this Code or any other Snowflake policy conflicts with law, follow the law. Ask the Legal team if you have any questions or comments about the correct course of action.

101.    With respect to "Financial Records," the Code of Conduct states:

We are required to follow strict accounting principles and standards, to maintain financial information accurately and completely, and to have appropriate internal controls and procedures to ensure that our accounting and financial reporting complies with law. Snowflake's financial and other disclosures must be full, fair, accurate, timely, and understandable.

**Compliance with Rules, Controls, and Procedures**

All transactions must be properly recorded, classified, and summarized in our financial statements, books, and records in accordance with our policies, controls, and procedures, as well as all generally accepted accounting principles, standards, laws, rules, and regulations for accounting and financial reporting (together, "Accounting Rules"). If you have responsibility for or any involvement in preparing financial or accounting records, you must understand and follow the relevant Accounting Rules. If you are a VP or higher, you must ensure that appropriate internal controls and procedures in your business area are in place, understood, and followed.

**Accuracy of Records and Reports**

Snowflake relies on records and reports to have complete, accurate, and timely information to make good decisions. Anyone involved in preparing financial or accounting records or reports, including financial statements and schedules, must make sure that those records and reports are complete, accurate, and timely. Anyone representing or certifying that records and reports are accurate should first make an inquiry or review adequate to establish a good faith belief in their accuracy.

Even if you are not directly involved in financial reporting or accounting, you are probably involved with financial records or reports of some kind—a certification voucher, timesheet, invoice, or expense report. In addition, most employees have involvement with product, marketing, or administrative activities, or performance evaluations, which can affect financial condition or results that we may share from time to time. Therefore, Snowflake expects everyone to make sure that business records and reports are accurate, complete, and reliable.

[…]

**Intentional Misconduct**

26

You may not intentionally misrepresent Snowflake's financial performance or otherwise intentionally compromise the integrity of Snowflake's reports, records, policies, or procedures. […].

**Audit Committee Charter**

102.     At all relevant times, the Company had in place its Audit Committee Charter which sets forth additional duties and responsibilities for the members of the Audit Committee – consisting of Defendants Garrett, Briggs, and Kramer.  The Audit Committee Charter provides that the Audit Committee be to monitor and advise the Board on: (i) the Company's corporate accounting and financial reporting processes, systems of internal control and financial-statement audits, and the integrity and quality of the Company's financial statements; (ii) review any Company reports or disclosures about financial or accounting information required by the applicable rules and regulations of the SEC and the rules, regulations, and requirements of the stock exchange that lists the Company's stock, taking into account any exceptions permitted by such stock exchange; (iii) the organization and performance of the Company's internal audit function; (iv) the Company's legal and regulatory compliance, including risk assessment; and (v) provide regular reports and information to the Board with respect to material issues.

103.     The Audit Committee Charter also sets forth these specific duties, in relevant part:

[] The Committee will review the annual audited financial statements, the quarterly financial statements, and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditor. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K

[] The Committee will review and discuss with management and the Auditor, as appropriate, any earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies. As part of this discussion, the Committee shall review any use of "pro forma," "adjusted," or non-GAAP information and any other financial information and earnings guidance provided to analysts and/or rating agencies. The Chair may represent the entire Committee for the purposes of this discussion.

[] The Committee will review and discuss with management and the Auditor the Company's processes and policies on risk identification, management, and assessment in all areas of the Company's business […].

[] The Committee will confer with management and the Auditor concerning the scope, design, adequacy, and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures, including (i) the Company's processes and controls surrounding the compilation and reporting of any "pro forma," "adjusted," or non-GAAP information included in quarterly earnings releases or SEC filings and (ii) any significant deficiencies or significant changes in internal controls. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

[] The Committee will review management's disclosure to the Committee and the independent auditor under Section 302 of the Sarbanes-Oxley Act, including identified changes in internal control over financial reporting.

[] The Committee will review the results of management's efforts to monitor compliance with the Company's programs and policies adhering to applicable laws and rules, including the Company's code of conduct. […].

[] The Committee will perform such other functions and have such other powers as may be necessary or appropriate in complying with applicable law, rules, regulations, or this Charter.

## **DUTIES OF THE DIRECTOR DEFENDANTS**

104.    As members of The Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

105.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

106.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director

Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

107.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

108.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

109.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

110.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

111.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful

conduct as alleged herein.

112.    Plaintiff is an owner of the Company's stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

113.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

114.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

115.    At the time this suit was filed, the Board was comprised of eleven (11) members – the Director Defendants, as defined *supra*, along with Non-Parties Ramaswamy, McLaughlin, and Burke (collectively here, the "Current Directors").  Thus, Plaintiff is required to show that a majority of the Current Directors, *i.e.,* six (6), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

116.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

117.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

118.    Each of the Director Defendants approved and/or permitted the wrongs alleged

herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

119.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

120.    Additionally, each of the Current Directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

<div align="center">

**THE DIRECTOR DEFENDANTS ARE
NOT INDEPENDENT OR DISINTERESTED**

</div>

**Defendant Dageville**

121.    Defendant Dageville is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its President of Products and Co-Founder) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent, as admitted by the Company in its 2023 Proxy Statement.   As such, Defendant Dageville cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

122.    As a co-founder, Defendant Dageville is inherently and irreconcilably conflicted as he could not consider a demand to sue the officers and directors of the Company that he created, which could have an adverse impact on both the Company and his ongoing employment.

123.    In addition, Defendant Dageville receives lucrative compensation in connection with his employment with the Company. Defendant Dageville is not independent from Defendants

Ullal and Speiser, and Non-Parties McLaughlin and Burke as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Dageville. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Dageville could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

124. Defendant Dageville has served as a Company director at all relevant times hereto. As a director, Defendant Dageville was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Dageville failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

125. As a trusted Company director, Defendant Dageville conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

126. Further, Defendant Dageville, while in possession of material, non-public information about the Company, sold copious amounts of Company stock at artificially inflated prices, reaping large proceeds as a result. As a result of his unlawful and improper insider trading, Defendant Dageville faces a substantial likelihood of liability and cannot be considered independent.

127.    Moreover, Defendant Dageville signed and therefore personally made the false and misleading statements contained in the Prospectus, subsequent amendments, the above-referenced Quarterly Reports filed on Form 10-Q, and Annual Reports filed on Form 10-K, and faces a substantial likelihood of liability therefor.

128.    Defendants Dageville and Burton have a longstanding professional relationship with each other, stemming from at least 1996. Defendant Dageville served as an Architect, and held other positions, with Oracle from 1995 through to 2012. At the same time, Defendant Burton held various senior executive roles within Oracle from 1995 through to 2002. As a result of this longstanding business relationship, Defendants Dageville and Burton are each indebted to one another and are thus incapable of impartially considering a demand to sue each other for the wrongdoing alleged herein.

129.    Defendant Dageville also solicited the 2021 Proxy Statement which contained the false and misleading representations and omissions, and was re-elected to the Board as a result. Accordingly, Defendant Dageville faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

130.    Defendant Dageville is neither independent nor disinterested. Any demand upon Defendant Dageville is futile and, thus, excused.

**Defendant Slootman**

131.    Defendant Slootman is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its former CEO) was an employee of the Company who derived substantially all of his income from his employment with the Company, making him not independent, as admitted by the Company in its 2023 Proxy Statement.  As such, Defendant Slootman cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company.

132.    As former CEO, Defendant Slootman also fails the NYSE's bright-line

independence test and cannot, therefore, be considered independent. As such, Defendant Slootman could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Slootman is therefore futile.

133. In addition, Defendant Slootman receives lucrative compensation in connection with his employment with the Company. As such, Defendant Slootman is not independent from Defendants Ullal and Speiser, and Non-Parties McLaughlin and Burke as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Slootman. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Slootman could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

134. Defendant Slootman has served as a Company director at all relevant times hereto. As a director, Defendant Slootman was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Slootman failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

135. As a trusted Company director, Defendant Slootman conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

136.    Because of Defendant Slootman's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Slootman is unable to comply with his fiduciary duties and prosecute this action.  Defendant Slootman is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action, brought under the Securities Exchange Act of 1934.

137.    Further, Defendant Slootman, while in possession of material, non-public information about the Company, sold copious amounts of Company stock at artificially inflated prices, reaping large proceeds as a result. As a result of his unlawful and improper insider trading, Defendant Slootman faces a substantial likelihood of liability and cannot be considered independent.

138.    Moreover, Defendant Slootman signed and therefore personally made the false and misleading statements contained in the Prospectus, subsequent amendments, the above-referenced Quarterly Reports filed on Form 10-Q, and Annual Report on Form 10-K, and faces a substantial likelihood of liability therefor.

139.    Defendants Slootman and Burton have a longstanding professional relationship with each other, stemming from at least 2010. Defendant Slootman served as a senior executive of EMC from 2009 through to 2011. At the same time, Defendant Burton held senior executive roles at EMC from 2010 through to 2016. As a result of this longstanding business relationship, Defendants Slootman and Burton are each indebted to one another and are thus incapable of impartially considering a demand to sue each other for the wrongdoing alleged herein.

140.    Defendant Slootman also solicited the 2021 Proxy Statement which contained the false and misleading representations and omissions. Accordingly, Defendant Slootman faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

141.    Defendant Slootman is neither independent nor disinterested. Any demand upon Defendant Slootman is futile and, thus, excused.

**Defendant Speiser**

142.    Defendant Speiser has served as a Company director at all relevant times hereto. As a director, Defendant Speiser was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Speiser failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

143.    As a trusted Company director, Defendant Speiser conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

144.    Additionally, in connection with his role as a Company director, Defendant Speiser receives substantial income. Accordingly, Defendant Speiser cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

145.    Further, Defendant Speiser, while in possession of material, non-public information about the Company, sold copious amounts of Company stock at artificially inflated prices, reaping large proceeds as a result. As a result of his unlawful and improper insider trading, Defendant Speiser faces a substantial likelihood of liability and cannot be considered independent.

146.    Moreover, Defendant Speiser signed and therefore personally made the false and misleading statements contained in the Prospectus, Quarterly Reports filed on Form 10-Q, and Annual Report filed on Form 10-K, and faces a substantial likelihood of liability therefor.

147. In addition, Defendant Speiser previously served as the Company's part-time CEO and CFO between August 2012 and June 2014. Thus, Defendant Speiser was an employee of the Company and derived a substantial portion of his income from that employment. As a result of his prior employment as CEO and CFO of the Company, Defendant Speiser cannot be considered independent.

148. Defendants Speiser and Burton have a longstanding professional relationship with each other, as, according to the Company's website, each of them held roles within Symantec and Veritas. In addition, both Defendants Speiser and Burton presently serve as members of the Advisory Board of McLaren. As a result of this longstanding business relationship, Defendants Speiser and Burton are each indebted to one another and are thus incapable of impartially considering a demand to sue each other for the wrongdoing alleged herein.

149. Defendant Speiser also solicited the 2021 Proxy Statement which contained the false and misleading representations and omissions. Accordingly, Defendant Speiser faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

150. Defendant Speiser is neither independent nor disinterested. Any demand upon Defendant Speiser is futile and, thus, excused.

**Defendant Kramer**

151. Defendant Kramer has served as a Company director at all relevant times hereto. As a director, Defendant Kramer was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Kramer failed to fulfil

these duties by permitting the false and misleading statements to be made and not correcting those statements.

152. As a trusted Company director, Defendant Kramer conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

153. Defendant Kramer also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Kramer is required to oversee, *inter alia*: (i) the Company's corporate accounting and financial reporting processes, systems of internal control and financial-statement audits, and the integrity and quality of the Company's financial statements; (ii) review any Company reports or disclosures about financial or accounting information required by the applicable rules and regulations of the SEC and the rules, regulations, and requirements of the stock exchange that lists the Company's stock, taking into account any exceptions permitted by such stock exchange; (iii) the organization and performance of the Company's internal audit function; (iv) the Company's legal and regulatory compliance, including risk assessment; and (v) provide regular reports and information to the Board with respect to material issues. Despite this, Defendant Kramer failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Kramer faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

154. Additionally, in connection with her role as a Company director, Defendant Kramer receives substantial income. Accordingly, Defendant Kramer cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including herself.

155. Moreover, Defendant Kramer signed and therefore personally made the false and misleading statements contained in the Prospectus, Quarterly Reports filed on Form 10-Q, and Annual Report filed on Form 10-K, and faces a substantial likelihood of liability therefor.

156.     Defendants Kramer and Garrett have a longstanding professional relationship with each other, stemming from at least 2018. Defendant Kramer served as CFO of Cisco from 2012 through to 2020. At the same time, Defendant Garrett served as a director of Cisco from 2018 through the present. As a result of this longstanding business relationship, Defendants Kramer and Garrett are each indebted to one another and are thus incapable of impartially considering a demand to sue each other for the wrongdoing alleged herein.

157.     Defendant Kramer also solicited the 2021 Proxy Statement which contained the false and misleading representations and omissions. Accordingly, Defendant Kramer faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

158.     Defendant Kramer is neither independent nor disinterested. Any demand upon Defendant Kramer is futile and, thus, excused.

**Defendant Burton**

159.     According to the Company's 2023 Proxy Statement, Defendant Burton is not an independent director. Accordingly, demand is futile as to him for that reason and for those that follow.

160.     Defendant Burton has served as a Company director at all relevant times hereto. As a director, Defendant Burton was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Burton failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

40

161.    As a trusted Company director, Defendant Burton conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

162.    Additionally, in connection with his role as a Company director, Defendant Burton receives substantial income. Accordingly, Defendant Burton cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

163.    Further, Defendant Burton, while in possession of material, non-public information about the Company, sold copious amounts of Company stock at artificially inflated prices, reaping large proceeds as a result. As a result of his unlawful and improper insider trading, Defendant Burton faces a substantial likelihood of liability and cannot be considered independent.

164.    Moreover, Defendant Burton signed and therefore personally made the false and misleading statements contained in the Prospectus, Quarterly Reports filed on Form 10-Q, and Annual Report filed on Form 10-K, and faces a substantial likelihood of liability therefor.

165.    Defendants Burton and Dageville have a longstanding professional relationship with each other, stemming from at least 1996. Defendant Burton held various senior executive roles within Oracle from 1995 through to 2002. At the same time, Defendant Dageville served as an Architect, and held other positions, with Oracle from 1995 through to 2012. As a result of this longstanding business relationship, Defendants Burton and Dageville are each indebted to one another and are thus incapable of impartially considering a demand to sue each other for the wrongdoing alleged herein.

166.    Defendants Burton and Slootman have a longstanding professional relationship with each other, stemming from at least 2010. Defendant Burton held senior executive roles at EMC from 2010 through to 2016. At the same time, Defendant Slootman served as a senior executive of EMC from 2009 through to 2011. As a result of this longstanding business relationship, Defendants Burton and Slootman are each indebted to one another and are thus

incapable of impartially considering a demand to sue each other for the wrongdoing alleged herein.

167.    Defendants Burton and Speiser have a longstanding professional relationship with each other, as, according to the Company's website, each of them held roles within Symantec and Veritas. In addition, both Defendants Burton and Speiser presently serve as members of the Advisory Board of McLaren. As a result of this longstanding business relationship, Defendants Burton and Speiser are each indebted to one another and are thus incapable of impartially considering a demand to sue each other for the wrongdoing alleged herein.

168.    Defendant Burton also solicited the 2021 Proxy Statement which contained the false and misleading representations and omissions. Accordingly, Defendant Burton faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

169.    Defendant Burton is neither independent nor disinterested. Any demand upon Defendant Burton is futile and, thus, excused.

**Defendant Briggs**

170.    Defendant Briggs has served as a Company director at all relevant times hereto. As a director, Defendant Briggs was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Briggs failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

171.    As a trusted Company director, Defendant Briggs conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously

disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

172. Defendant Briggs also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Briggs is required to oversee, *inter alia*: (i) the Company's corporate accounting and financial reporting processes, systems of internal control and financial-statement audits, and the integrity and quality of the Company's financial statements; (ii) review any Company reports or disclosures about financial or accounting information required by the applicable rules and regulations of the SEC and the rules, regulations, and requirements of the stock exchange that lists the Company's stock, taking into account any exceptions permitted by such stock exchange; (iii) the organization and performance of the Company's internal audit function; (iv) the Company's legal and regulatory compliance, including risk assessment; and (v) provide regular reports and information to the Board with respect to material issues. Despite this, Defendant Briggs failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Briggs faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

173. Additionally, in connection with her role as a Company director, Defendant Briggs receives substantial income. Accordingly, Defendant Briggs cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

174. Further, Defendant Briggs, while in possession of material, non-public information about the Company, sold copious amounts of Company stock at artificially inflated prices, reaping large proceeds as a result. As a result of her unlawful and improper insider trading, Defendant Briggs faces a substantial likelihood of liability and cannot be considered independent.

175. Moreover, Defendant Briggs signed and therefore personally made the false and misleading statements contained in the Prospectus, Quarterly Reports filed on Form 10-Q, and Annual Report filed on Form 10-K, and faces a substantial likelihood of liability therefor.

176.     Defendant Briggs also solicited the 2021 Proxy Statement which contained the false and misleading representations and omissions. Accordingly, Defendant Briggs faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

177.     Defendant Briggs is neither independent nor disinterested. Any demand upon Defendant Briggs is futile and, thus, excused.

**Defendant Garrett**

178.     Defendant Garrett has served as a Company director at all relevant times hereto. As a director, Defendant Garrett was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Garrett failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

179.     As a trusted Company director, Defendant Garrett conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

180.     Defendant Garrett also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Garrett is required to oversee, *inter alia*: (i) the Company's corporate accounting and financial reporting processes, systems of internal control and financial-statement audits, and the integrity and quality of the Company's financial statements; (ii) review any Company reports or disclosures about financial or accounting

information required by the applicable rules and regulations of the SEC and the rules, regulations, and requirements of the stock exchange that lists the Company's stock, taking into account any exceptions permitted by such stock exchange; (iii) the organization and performance of the Company's internal audit function; (iv) the Company's legal and regulatory compliance, including risk assessment; and (v) provide regular reports and information to the Board with respect to material issues. Despite this, Defendant Garrett failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Garrett faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

181.    Additionally, in connection with his role as a Company director, Defendant Garrett receives substantial income. Accordingly, Defendant Garrett cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

182.    Further, Defendant Garrett, while in possession of material, non-public information about the Company, sold copious amounts of Company stock at artificially inflated prices, reaping large proceeds as a result. As a result of his unlawful and improper insider trading, Defendant Garrett faces a substantial likelihood of liability and cannot be considered independent.

183.    Moreover, Defendant Garrett signed and therefore personally made the false and misleading statements contained in the Prospectus, Quarterly Reports filed on Form 10-Q, and Annual Report filed on Form 10-K, and faces a substantial likelihood of liability therefor.

184.    Defendants Garrett and Kramer have a longstanding professional relationship with each other, stemming from at least 2018. Defendant Garrett served as a director of Cisco from 2018 through the present. At the same time, Defendant Kramer served as CFO of Cisco from 2012 through to 2020. As a result of this longstanding business relationship, Defendants Garrett and Kramer are each indebted to one another and are thus incapable of impartially considering a demand to sue each other for the wrongdoing alleged herein.

185.    Defendant Garrett also solicited the 2021 Proxy Statement which contained the

45

false and misleading representations and omissions, and was re-elected to the Board as a result. Accordingly, Defendant Garrett faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

186.    Defendant Garrett is neither independent nor disinterested. Any demand upon Defendant Garrett is futile and, thus, excused.

**Defendant Ullal**

187.    Defendant Ullal has served as a Company director at all relevant times hereto. As a director, Defendant Ullal was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Ullal failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

188.    As a trusted Company director, Defendant Ullal conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

189.    Additionally, in connection with her role as a Company director, Defendant Ullal receives substantial income, more than any other director. Accordingly, Defendant Ullal cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

190.    Moreover, Defendant Ullal signed and therefore personally made the false and misleading statements contained in the Prospectus, Quarterly Reports filed on Form 10-Q, and

Annual Report filed on Form 10-K, and faces a substantial likelihood of liability therefor.

191.    Defendant Ullal also solicited the 2021 Proxy Statement which contained the false and misleading representations and omissions, and was re-elected to the Board as a result. Accordingly, Defendant Ullal faces a substantial likelihood of liability for the damage caused to the Company through the violations of Section 14(a) of the Exchange Act and is thus in a position of irreconcilable conflict and could not independently consider a litigation demand.

192.    Defendant Ullal is neither independent nor disinterested. Any demand upon Defendant Ullal is futile and, thus, excused.

**Non-Party McLaughlin**

193.    As a director, Non-Party McLaughlin is required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Non-Party McLaughlin failed to take any action to remedy the wrongdoing alleged herein.

194.    Despite being a trusted Company director since 2023, Non-Party McLaughlin has consciously disregarded his duties and failed to take any action on behalf of the Company to bring these proceedings against the Individual Defendants. As such, Non-Party McLaughlin evidently cannot consider a demand to sue or act in the best interests of the Company. Thus, demand is futile as to him.

195.    Additionally, in connection with his role as a Company director, Non-Party McLaughlin receives substantial income. Accordingly, Non-Party McLaughlin cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

196.    Non-Party McLaughlin is neither independent nor disinterested. Any demand upon

Non-Party McLaughlin is futile and, thus, excused.

**Non-Party Burke**

197.   As a director, Non-Party Burke is required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Non-Party Burke failed to take any action to remedy the wrongdoing alleged herein.

198.   Despite being a trusted Company director since 2023, Non-Party Burke has consciously disregarded his duties and failed to take any action on behalf of the Company to bring these proceedings against the Individual Defendants. As such, Non-Party Burke evidently cannot consider a demand to sue or act in the best interests of the Company. Thus, demand is futile as to him.

199.   Additionally, in connection with his role as a Company director, Non-Party Burke receives substantial income. Accordingly, Non-Party Burke cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

200.   Non-Party Burke is neither independent nor disinterested. Any demand upon Non-Party Burke is futile and, thus, excused.

**Non-Party Ramaswamy**

201.   Non-Party Ramaswamy is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its president and CEO) is an employee of the Company who derives substantially all of his income from his employment with Advance Auto Parts, making him not independent. As such, Non-Party Ramaswamy cannot independently consider any demand to sue himself for breaching his fiduciary duties to Advance Auto Parts, because that would expose him to liability and threaten his livelihood.

202.    As CEO, Non-Party Ramaswamy also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent, as admitted by the Company on its Investor Relations website. As such, Non-Party Ramaswamy could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Non-Party Ramaswamy is therefore futile.

203.    In addition, Non-Party Ramaswamy receives lucrative compensation in connection with his employment with the Company. As such, Non-Party Ramaswamy is not independent from Defendants Ullal and Speiser, and Non-Parties McLaughlin and Burke as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Non-Party Ramaswamy. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Non-Party Ramaswamy could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

204.    As a director, Non-Party Ramaswamy is required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Non-Party Ramaswamy failed to take any action to remedy the wrongdoing alleged herein.

205.    Despite being a trusted executive and director since 2023, Non-Party Ramaswamy has consciously disregarded his duties and failed to take any action on behalf of the Company to bring these proceedings against the Individual Defendants. As such, Non-Party Ramaswamy evidently cannot consider a demand to sue or act in the best interests of the Company. Thus,

49

demand is futile as to him.

206.    Non-Party Ramaswamy is neither independent nor disinterested. Any demand upon Non-Party Ramaswamy is futile and, thus, excused.

**Additional Reasons Demand is Futile**

207.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

208.    The Company, at all material times, had its Code of Conduct, Business Code, and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

209.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

210.    The Current Directors received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.

They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

211.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Current Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

212.    Publicly traded companies, such as Snowflake, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Current Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

213.    Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIMS FOR RELIEF

## COUNT I

### (Against the Individual Defendants for Breach of Fiduciary Duties)

214.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

51

215.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

216.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

217.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

218.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

219.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT II

### (Against the Individual Defendants for Gross Mismanagement)

220.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

221.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

222.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

223.   Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

### COUNT III

### (Against the Individual Defendants for Waste of Corporate Assets)

224.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

225.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

226.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

227.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

### COUNT IV

### (Against the Individual Defendants for Unjust Enrichment)

228.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

229.   By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

230. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

231. Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## COUNT V

### (Against the Director Defendants for Aiding and Abetting)

232. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

233. The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Individual Defendants.

234. Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law as alleged herein, and failing to report the same.

235. As a result, the Director Defendants substantially assisted the Individual Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

236. As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

54

237.   As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT VI

### (Against Defendants Slootman, Scarpelli, Dageville, Speiser, Burton, Briggs, Garrett, Eschenbach, and McMahon for Insider Trading)

238.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

239.   By reason of their fiduciary roles as officers, directors, and/or controlling persons of the Company, Defendants Slootman, Scarpelli, Dageville, Speiser, Burton, Briggs, Garrett, Eschenbach, and McMahon (the "Insider Trading Defendants") specifically owed the Company the highest obligation of due care, good faith, and loyalty.

240.   As officers, directors, and/or controlling persons of the Company, the Insider Trading Defendants were given access, directly or indirectly, to material information about the Company, as described above, which was not generally available to the public.

241.   When the Insider Trading Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information, as described above, and sold Company stock on the basis of such information; information which they each knew had a significant effect on the market price of the Company's stock.

242.   The information described above was proprietary, non-public information concerning the Company's business operations and financial condition.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold holdings in Company stock.  The Insider Trading Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

243.   The Insider Trading Defendants have each violated applicable state and federal laws by engaging in illicit insider trading.

244.   As the use of the Company's proprietary information for their own personal gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

## COUNT VII

**(Against Defendants Dageville, Garrett, Ullal, Kramer, Slootman, Speiser, Briggs, Burton, Eschenbach, and McMahon for Violations of Section 14(a) of the Securities Exchange Act of 1934)**

245.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

246.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

247.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

248.   Under the watch and direction of Defendants Dageville, Garrett, Ullal, Kramer, Slootman, Speiser, Briggs, Burton, Eschenbach, and McMahon (the "Proxy Defendants"), the 2021 Proxy Statement failed to disclose that (i) the Board did not effectively manage risk, which ultimately resulted in a reduced product revenue growth rate; (ii) the Board's corporate governance

was insufficient; (iii) despite the existence of the Insider Trading Policy, certain Company insiders engaged in unlawful insider trading; and (iv) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly interested in their re-election to the Board to allow themselves to continue breaching their fiduciary duties to the Company.

249. Further, the 2021 Proxy Statement also failed to disclose that (i) Snowflake had systematically oversold capacity to customers which created a misleading appearance of the demand for Snowflake's products and services; (ii) Snowflake had provided significant discounts to its customers prior to its IPO that temporarily boosted sales but would not be sustainable after the IPO and/or necessitate platform efficiency adjustments that negatively impacted client consumption and Snowflake's revenue and profit margins; (iii) as a result, Snowflake's customers were poised to roll over a material amount of unused credits (and thereby cannibalize future sales) at the end of their contracts' terms or to refuse to renew their contracts at prior consumption levels or at all; and (iv) consequently, Snowflake's product revenue and remaining performance obligations had been artificially inflated leading up to and during the Relevant Period; and (v) that, as a result, defendants lacked a reasonable basis for their positive statements about Snowflake's business, financials, and growth trajectory.

250. The Proxy Defendants also caused the 2021 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

251. Moreover, the 2021 Proxy Statement was false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct and Ethics, due to the Individual Defendants' failures to abide by them and their causing

the Company to engage in improper accounting practices and issue false and misleading statements and/or omissions of material fact.

252.    In the exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the re-election of directors.

253.    The misrepresentations and omissions set forth herein were material to shareholders in voting on the proposals in the 2021 Proxy Statement who would not have approved: (i) the re-election of Defendants Dageville, Garrett, and Ullal to the Board.

254.    As a result of the respective Proxy Defendants causing the 2021 Proxy Statement to be false and misleading, Company shareholders approved the proposals set forth therein, and approved: (i) the re-election of Defendants Dageville, Garrett, and Ullal to the Board.

255.    The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the 2021 Proxy Statement.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' unjust enrichment;

D.    Awarding, against the Director Defendants and in favor of the Company, damages sustained by the Company as a result of the Director Defendants' aiding and abetting of the Individual Defendants' breaches of fiduciary duty;

E.     Awarding, against the Insider Trading Defendants and in favor of the Company, all illicit proceeds garnered through their unlawful insider trading;

F.     Awarding, against the Proxy Defendants and in favor of the Company, all damages sustained by the Company as a result of the Proxy Defendants' violations of Section 14(a) of the Securities Exchange Act of 1934;

G.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

H.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 4, 2024

**BIELLI & KLAUDER, LLC**

By: */s/ Ryan M. Ernst*
Ryan M. Ernst, Esq. (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Main: (302) 803-4600
Direct: (302) 321-5411
Email: rernst@bk-legal.com

Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGLESTON**
260 Madison Avenue, 22nd Fl.
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*